# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOANNE TERRAZAS and DIANE BORGNA, Individually and On Behalf Of All Others Similarly Situated, | ) ) ) **CIVIL ACTION NO**.: |
| Plaintiffs, | ) ) |
| vs. | ) **CLASS ACTION COMPLAINT** |
| | ) **FOR VIOLATIONS OF THE** |
| THE BANK OF NEW YORK MELLON CORPORATION, THE BENEFITS ADMINISTRATION COMMITTEE, ROBERT PEREGO, LISA B. PETERS, JOHN A. PARK, THE BENEFITS INVESTMENT COMMITTEE, LEO P. GROHOWSKI, THE APPOINTING AND MONITORING COMMITTEE, and JOHN DOES 1-30, | ) **EMPLOYEE RETIREMENT** ) **INCOME SECURITY ACT** ) ) ) ) **JURY TRIAL DEMANDED** ) ) ) |
| Defendants. | ) *Electronically Filed* |

Plaintiffs, Joanne Terrazas and Diane Brogna ("Plaintiffs"), individually and on behalf of a class of similarly situated participants in and beneficiaries of The Bank of New York Mellon Corporation 401(k) Savings Plan (the "401(k) ") and the Employee Stock Ownership Plan ("ESOP") (each a "Plan" and collectively, the "Plans"), allege the following based upon the investigation of their counsel, and upon personal knowledge as to facts pertaining to them and on information and belief as to all other facts:

## **INTRODUCTION**

1.      This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against The Bank of New York Mellon Corporation ("BNY" or the "Company") and other fiduciaries of the Plans who are and were responsible for the investment of the assets and the administration of

the Plans between January 1, 2008 through and including the present (the "Class Period").

2.     During the Class Period, the Plan's fiduciaries, BNY and certain of its senior officers and directors, breached their fiduciary duties owed to the Plan's participants and beneficiaries (collectively, the "Participants"), causing the loss of millions of dollars of Participants' retirement savings.

3.     Plaintiffs were BNY employees and participants in the Companies 401(k) and ESOP during the Class Period.  As Plan Participants, Plaintiffs, like other members of the Class, were entitled to set aside a certain percentage of their annual base salary to invest in various investment options provided by the Plans.  Among the investment options in both Plans was BNY common stock.  Plaintiffs' investment portfolios in the Plans during the Class Period included BNY stock.

4.     401(k) employee saving plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan may have the option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investment portfolio.  Common stock of BNY was held by each of the Plans throughout the Class Period.   Throughout the Class Period, the Plans invested heavily in BNY common stock.   Because the Plan's holdings in BNY common stock comprised a significant percentage of the overall value of the Plan's investments held on behalf of the Participants, the long-term retirement savings of Participants were dependent, to a substantial degree, on the performance of BNY common stock.  So too were Participants'

retirement fortunes dependent on the related need for prudent fiduciary decisions by Defendants, concerning such a large, ongoing investment of the Plan's assets.

5.      BNY is a financial services company that provides various investment management products and services worldwide to assist corporations, financial institutions, and individuals in managing and servicing their financial assets.

6.      Among the services provided by BNY were indirect FX trades (also known as standing instructions), which the Company describes as "captur[ing] all types of custody-related foreign exchange funding needs and automates the currency execution and settlement." (*see*

*https://gm.bankofny.com/FX/TradeExecution/StandingInstruction.aspx*).  BNY's website states, "Standing Instruction provide a simple, flexible, and complete service solution that automates the capture of all types of custody-related foreign exchange, including securities trade settlement, income conversions, corporate actions, tax reclaims, interest postings, and residual balances." (*see*

*https://gm.bankofny.com/FX/TradeExecution/Default.aspx*).  BNY uses these standing instruction arrangements for handling a high volume of small transactions or difficult to execute transaction in restricted and emerging markets currencies.  However, under these standing instruction agreements, the investor does not negotiate or choose the exchange rate that is used by BNY.  While the Company touted its ability to provide "FX execution according to best execution standards" (*see*

*https://gm.bankofny.com/FX/TradeExecution/StandingInstruction.aspx*), the Company was, in fact, charging clients for fees beyond those that were permitted and negotiated for.

7.      Throughout the Class Period, BNY made a series of false and misleading statements and omissions regarding the exchange rates the Company used in connection with its standing instruction trades.  Rather than charging clients the prevailing FX rate at the time the FX trade was executed, BNY would note the low and high exchange rate of the day for the two currencies involved in the FX trade and charged its clients for the FX transaction as if the trade occurred at either the high or low of the day (depending on the nature of the transaction, buy or sell).  By charging the client with the least favorable exchange rate that occurred that trading day, BNY was able to keep the difference for itself as profit.

8.      Beginning in February 2011, the Company's practice of overcharging its clients in connection with the exchange rates BNY used in standing instruction FX transactions was exposed.  As a result, BNY has been sued in federal court in *Southeastern Pennsylvania Transportation Authority v. The Bank of New York Mellon Corp.,* Case Number 2:11-cv-01628-JHS, in the United States District Court for the Eastern District of Pennsylvania (the "Class Action"); *qui tam* suits including *State of Florida ex rel FX Analytics v. The Bank of New York Mellon Corp., et al.,* case Number 2009CA4140, in the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida (the "Florida Action"), a case in which the State of Florida intervened on or about August 11, 2011; *Commonwealth of Virginia ex rel. FX Analytics v. The Bank of New York Mellon Corp.,* Case Number CL-2009-15377, in the Circuit Court for Fairfax County, Virginia (the "Virginia Action"); *Schneiderman v. Liu et al.,* Index No. 09-114735, in the Supreme Court of the State of New York County of New York (the "New York Action"); *United States of America v. The Bank of New York Mellon Corp.,* No. 11-

Civ-6969, filed in the United States District Court for the Southern District of New York (the "USA Action"); and an investigation by the Securities and Exchange Commission into whether the Company's transactions with the pension funds breached securities laws and/or misrepresented how the Company intended to carry out foreign-exchange trades (the "SEC Investigation").

9.     As details publicly emerged regarding the Company's improper and unlawful trading practices, BNY's stock price plummeted, declining approximately 60% from a Class Period trading high of $49.40 per share on January 3, 2008 to a closing price of $20.92 per share on November 4, 2011, a price which is significantly less than the price at which the Plans and its participants were acquiring the stock during the Class Period.

10.     Plaintiffs allege that Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to them and to the other participants and beneficiaries of the Plans in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105, particularly with regard to the Plans' vast holdings of BNY stock.

11.     Specifically, Plaintiffs allege certain Defendants, each having certain responsibilities regarding the management and investment of Plans assets, breached their fiduciary duties to Plaintiffs, the Plans and proposed Class by failing to prudently and loyally manage the Plans' investment in Company securities by (1) continuing to offer BNY common stock as a Plan investment option and permitting the Plans to buy and hold shares of BNY common stock when it was imprudent to do so; (2) failing to provide complete and accurate information to Plan participants regarding the Company's standing

instructions for FX transactions necessary to enable Plan participants to make informed investment decisions concerning their participation in and contributions to the Plans; (3) encouraging BNY employees to invest in the Plans; and (4) investing Company matching contributions in the 401(k) during the Class Period and failing to divest the Plan from shares of BNY stock when continuing to do so became imprudent as a result of BNY's false and misleading statements and omissions regarding its practice of overcharging its clients for processing standing instructions pursuant to FX transactions. These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement. *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

12.     This action is brought on behalf of the Plans and seeks losses to the Plans for which Defendants are liable pursuant to ERISA § 502 and 29 U.S.C. § 1132. Because Plaintiffs' claims apply to the Plans, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiffs to sue for relief to the Plans for breaches of fiduciary duty such as those alleged herein, Plaintiffs brings this as a class action on behalf of the Plans and all participants and beneficiaries of the Plans during the proposed Class Period.

## <u>JURISDICTION AND VENUE</u>

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

14.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

## PARTIES

15.     Plaintiff, Joanne Terrazas, is a plan "participant," within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held BNY shares in her account during the Class Period.  Among other available options under the Plan, Plaintiff selected the BNY Stock Fund for her retirement account.

16.     Plaintiff, Diane Brogna, is a plan "participant," within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held BNY shares as a participating member of the ESOP during the Class Period.

17.     BNY is a Delaware corporation with its headquarters located at One Wall Street, New York, NY 10286.[1]  BNY is a financial services company that provides various investment management products and services worldwide to assist institutions and individuals in managing and servicing their financial assets.  BNY is both the sponsor and administrator of the Plans.  During the Class Period, BNY common stock traded on the New York Stock Exchange under the symbol "BK."

18.     Defendant Administration Committee served as the administrator and "named fiduciary" of the Plan during the Class Period.  According to BNY's Form 5500 for the Plan filed with the Department of Labor and the Department of the Treasury for the fiscal year ending December 31, 2009 (the "Form 5500"), the Administration Committee administers the Plan at BNY Mellon Center, 500 Grant Street, Room 3118, Pittsburgh, PA 15258-0001.

19.     Pursuant to the 11-K filed with the SEC on June 24, 2011, the Administration Committee "has full discretionary power and authority to construe,

---

[1]     On July 1, 2007, The Bank of New York Company, Inc. and Mellon Financial Corporation merged to form BNY.

interpret and administer the Plan, including questions concerning eligibility and payment of benefits and may adopt rules and regulations for administering the Plan."  According to the Plan's Summary Plan Description ("SPD"), the Administration Committee "also has the authority to retain individuals to assist with the Plan's administration.  The [Administration] Committee's decisions are final and binding upon all parties, including [BNY], its employees, and the Plan's participants.  In addition, the Administration Committee "is responsible for investment-related matters, including the establishment of an investment policy, the appointment of investment managers, and the monitoring of the performance of the Plan's investment funds."  Members of the Administration Committee were appointed by the Monitoring Committee and included officers and other employees of BNY who participated in managing and administering the Plan.

20.     Defendant Robert Perego ("Perego") served as a member of the Administration Committee during the Class Period.  Defendant Perego signed BNY's Form 5500 as the individual signing as the plan sponsor and plan administrator.  Perego was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

21.     Defendant Lisa B. Peters ("Peters") served as a member of the Administration Committee during the Class Period and signed the 11-K as an individual duly authorized by the Administration Committee to sign the 11-K on its behalf.  Peters was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

22.     Defendant John A. Park ("Park") served as a member of the Administration Committee during the Class Period and signed the 11-K as an individual duly authorized by the Administration Committee to sign the 11-K on its behalf.  In addition, Park signed BNY's Form 10-Qs filed with the SEC during the Class Period as the Duly Authorized Officer and Principal Accounting Officer of BNY.  Park was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

23.     Defendant John Does 1-10 consist of the remaining members of the Administration Committee.  Because Plaintiffs are currently unaware of the true identities and capacities of the remaining members of the Administration Committee, those individuals are named as John Does 1-10.  The remaining members of the Administration Committee, whose real names will be substituted when they are known to Plaintiffs, exercised discretionary authority and discretionary control with respect to the management of the Plan and their assets.

24.     Defendants Perego, Peters, Park, and John Does 1-10 are collectively referenced herein as the "Administration Committee Defendants."

25.     Defendant Investment Committee is responsible for overseeing investment-related matters with the respect to the Plan, including the establishment of an investment policy, the appointment of investment managers, and the monitoring of the performance of the Plan's investment funds.  Members of the Investment Committee were appointed by the Monitoring Committee and included officers and other employees of BNY who participated in managing and administering the Plans.

26.     Defendant Leo P. Grohowski ("Grohowski") served as a member of the Investment Committee during the Class Period.

27.     Defendant John Does 11-20 consist of the remaining members of the Investment Committee.  Because Plaintiffs are currently unaware of the true identities and capacities of the remaining members of the Investment Committee, those individuals are named as John Does 11-20.  The remaining members of the Investment Committee, whose real names will be substituted when they are known to Plaintiffs, exercised discretionary authority and discretionary control with respect to the management of the Plan and their assets.

28.     Defendants Grohowski and John Does 11-20 are collectively referenced herein as the "Investment Committee Defendants."

**Monitoring Committee**

29.     Defendant Monitoring Committee is comprised of senior management of BNY and is responsible for selecting, monitoring, and removing members of the Administration Committee and Investment Committee.

30.     Defendant John Does 21-30 consist of the remaining members of the Monitoring Committee.  Because Plaintiffs are currently unaware of the true identities and capacities of the remaining members of the Monitoring Committee, those individuals are named as John Does 21-30.  The remaining members of the Monitoring Committee, whose real names will be substituted when they are known to Plaintiffs, exercised discretionary authority and discretionary control with respect to the management of the Plan and their assets.

31.     Defendants John Does 21-30 are collectively referenced herein as the "Monitoring Committee Defendants."

10

## THE PLANS

### 401(k)  Employee Savings Plan

32.     The 401(k) is an "employee pension benefit plan," as defined by ERISA §

3(2)(A).[2]  Specifically, the Plan is a "defined contribution plan" within the meaning of

ERISA § 3(34), 29 U.S.C. §1002(34), in that separate individual Plan accounts are

maintained for each participant based upon the amount contributed to each participant's

account.

33.     Employees are eligible to participate in the Plan if they are a salaried U.S.

employee of BNY or a subsidiary of BNY which has elected to have its U.S. employees

covered by the Plan.   Employees are eligible in the Plan after completing 1,000 hours of

employment with BNY within a year.

34.     BNY's 401(k) Summary Plan Description ("SPD") stated that "saving for

retirement is a shared responsibility," and attracted employee participation therein by,

"providing a plan that encourages you to save, while helping you reach your retirement

goals with Company contributions."

35.     The Plan is a defined contribution plan sponsored by the Company and is

intended to meet the requirements of ERISA.  The Plan provides employees with the

opportunity to invest a portion of their annual compensation in the Plan, augmented by

Company matching contributions, to provide for additional income in their retirement.

36.     According to the April 2011 SPD, participants were able to contribute

between 1% and 75% of their semi-monthly base pay.  For 2010, BNY matched 100% of

---

[2] On April 1, 2009, the Employee Savings & Investment Plan of The Bank of New York Company, Inc.
merged with and into the Mellon 401(k) Retirement Savings Plan and the resulting plan was renamed "The
Bank of New York Mellon Corporation 401(k) Savings Plan."  On July 1, 2010, BNY acquired PNC

the first 6% of each Participant's salary reduction and/or after tax contributions. Prior to April 1, 2009, BNY's matching contributions were made in BNY common stock based upon the three-day average close on the New York Stock Exchange. Beginning April 1, 2009, BNY's matching contributions were made in cash.

37.      The Plan offers a variety of investment alternatives, including lifecycle funds, collective funds, mutual funds, and BNY common stock. According to the Form 11-K filed by BNY with the Securities and Exchange Commission ("SEC") on June 24, 2011 (the "11-K"), as of the fiscal year ended December 31, 2010, approximately 12% of the Plan's assets were held in BNY common stock, worth a fair value of investment of $935,430,715.

38.      According to the BNY "Personal Securities Trading Policy" in the SPD, Plan participants are subject to restrictions such that they "may not buy and then sell (or sell and then buy) BNY Mellon common stock within a period of less than 60 days. Making more than one purchase or more than one sale is permitted, but opposing transfers are a violation of the Policy."

39.      The Plan is administered by the Benefits Administration Committee which has full discretionary power and authority to administer the Plan and is responsible for investment related matters

40.      The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(l). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, and the law

---

Global Investment Servicing, Inc., resulting in the merger of the PNC Global Investment Servicing Inc. Retirement Savings Plan into The Bank of New York Mellon Corporation 401(k) Savings Plan.

interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

**The Employee Stock Ownership Plan**

41.      The Plan is purportedly an employee stock ownership plan (an "ESOP") and is generally available to certain domestic full-time employees with more than one year of service.

42.      The Plan is a defined contribution plan maintained by BNY to provide retirement benefit to eligible employees of BNY and its subsidiaries.  Participants have the right to direct investments of certain of their accounts under the Plan.  The selection and monitoring of the Plan's investment options is overseen by the Benefits Investment Committee ("BIC"), whose members are BNY corporate officers.

43.      Employees are entitled to the higher of their benefit under the ESOP or such defined benefit pension plan at retirement.  Benefits payable under the defined benefit pension plan are offset by the equivalent value of benefits earned under the ESOP

44.      The plan invests in BNY common stock.

45.      As of December 31, 2008, the ESOP owned 8.5 million shares of Company stock and the fair value of total ESOP assets were $247 million.

46.      Fiduciaries of an ESOP remain bound by core ERISA fiduciaries duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

47.      Accordingly, if the fiduciaries know or if an adequate investigation would reveal that company stock no longer is a prudent investment for the ESOP, the fiduciaries

must disregard plans direction to maintain investments in such stock and protect the plans by investing the plans assets in other suitable investments.

## CLASS ACTION ALLEGATIONS

48.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plans, himself/herself and the following class of persons similarly situated (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of The Bank of New York Mellon Corporation 401(k) Savings Plan and/or The Bank of New York Mellon Corporation Employee Stock Ownership Plan at any time between January 1, 2008 through and including the present (the "Class Period") and whose Plan accounts included investments in BNY common stock.

49.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are hundreds of members of the Class who participated in, or were beneficiaries of, the Plans during the Class Period and whose Plan accounts included investment in BNY stock.  According to BNY's Form 5500 for the fiscal year 2009, at the end of the year 2009, The Bank of New York Mellon Corporation 401(k) Savings Plan had 42,466 total participants, active, retired, or separated who were entitled to or currently receiving benefits under the Plan and The Bank of New York Mellon Corporation Employee Stock Ownership Plan the ESOP owned 8.5 million shares of Company stock, the fair value of which was $247 million.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to the Plans, Plaintiffs and members of the Class;

(b)     whether Defendants breached their fiduciary duties to the Plans, Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plans and the Plans' participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

(d)     whether the Plans and members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs, the Plans and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

52.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Plans or the Class.

53.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

54.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**DEFENDANTS' FIDUCIARY STATUS**

55.     During the Class Period, upon information and belief, each Defendant was a fiduciary of the Plans, either as a named fiduciary or as a de facto fiduciary with discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets.

56.     ERISA requires every plans to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plans."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

57.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

58.     Each of the Defendants was a fiduciary -- either as a named fiduciary or *de facto* fiduciary -- with respect to one or both of the Plans and owed fiduciary duties to one or both of the Plans and the participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

59.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans, and the Plans' investments solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

60.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

61.     Instead of delegating all fiduciary responsibility for the Plans to external service providers, the Company chose to assign the appointment and removal of fiduciaries, such as the Administrative Committee members, to itself.

62.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

63.     During the Class Period, all of Defendants acted as fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

**The Company's Fiduciary Status**

64.     Instead of delegating fiduciary responsibility for the Plans to external service providers, the Company chose to internalize certain vital aspects of this fiduciary function.

65.     During the Class Period, BNY was also a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because, BNY through its officers, directors or otherwise, exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets, and is therefore a fiduciary of the Plan.  BNY also exercised discretionary authority with respect to the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility.

66.     By failing to properly discharge their fiduciary duties under ERISA, the employee and officer defendants, including the Administrative, Investment and/or Monitoring Committee Defendants, breached fiduciary duties they owed to the Plans, their participants and their beneficiaries.  Such individuals were appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.  Accordingly, the actions of such employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

67.     In addition, BNY acted as a fiduciary in connection with the dissemination of Plan communications to the Plan's Participants.  BNY made direct representations to Participants relating specifically to the Plan's investment options, the business and financial condition of BNY, and the merits of investing the Plan's assets in BNY common stock, and those representations were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan.

68.     BNY was responsible for disseminating a SPD for the Plan to Participants.  BNY was also responsible for disseminating to Participants the Plan's prospectus ("Prospectus"), which purports to describe the investment characteristics of the Plan's various investment options.  The Prospectus and all information contained or incorporated therein constitute representations disseminated in a fiduciary capacity upon which Participants were entitled to rely in making decisions concerning their benefits and the investment and management of the Plan's assets allocated to their accounts.

69.     BNY's filings with the SEC, including but not limited to, annual reports, press releases, Forms 10-K, and Registration Statements, were incorporated by reference into the Prospectus, and Participants were directed to review the Prospectus for BNY disclosures of important information concerning BNY.  BNY exercised discretion over the contents of the SPDs and the Prospectuses it disseminated, which were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan.

70.     Under ERISA, BNY was not required to offer BNY common stock as an investment option under the Plan or to incorporate all of BNY's SEC filings into the

Plan's documents, but once it elected to do so, it rendered the disclosures contained in the SEC filings disclosures made in a fiduciary capacity.

**Administrative Committee's Fiduciary Status**

71.     The Administrative Committee is comprised of persons appointed by the Board and delegated the day-to-day responsibility for the administration of the Plans. The Administrative Committee and its members were fiduciaries of the Plans, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they were, upon information and belief, named fiduciaries of the Plans and exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

72.     According to the 11-K, the Administration Committee is a "named fiduciary" of the 401(k) and "has full discretionary power and authority to construe, interpret and administer the Plan, including questions concerning eligibility and payment of benefits and may adopt rules and regulations for administering the Plan."

73.     The Administration Committee Defendants were fiduciaries of the Plan because they made statements to Plan Participants and they exercised discretionary authority with respect to: (i) managing and administering the Plan; and/or (ii) managing and disposing of the Plan's assets.

74.     Perego is also a fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(2l)(A), in that Perego signed BNY's Form 5500 as the individual signing as the Plan's sponsor and the Plan's administrator.

**Investment Committee's Fiduciary Status**

75.     The Investment Committee is a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  Members of the Investment Committee were also fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that each member had discretionary authority and control regarding the administration and management of the Plan and/or the investment of the Plan's assets, and possessed the full authority in their absolute discretion to determine all investment-related questions with respect to the Plan.

76.     According to the 11-K and SPD, the Investment Committee is "the named fiduciary which is responsible for investment-related matters, including the establishment of an investment policy, the appointment of investment managers, and the monitoring of the performance of the Plan's investment funds."

77.     The Investment Committee Defendants were fiduciaries of the Plan because they exercised discretionary authority or control in selecting, evaluating, monitoring, and altering the makeup of the investment alternatives available under the Plan.  The Investment Committee Defendants also had the responsibility to provide complete and accurate information to Participants about the investment offerings in the Plan, either directly or by communicating that information to the Board.

**Monitoring Committee's Fiduciary Status**

78.     The Monitoring Committee is a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  Members of the Monitoring Committee were also fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that each member had discretionary authority and control regarding the administration

and management of the Plan and/or the investment of the Plan's assets, and possessed the full authority in their absolute discretion to determine all investment-related questions with respect to the Plan.

79.     Pursuant to the SPD, the Monitoring Committee is "the named fiduciary responsible for appointing, monitoring, and (if necessary) replacing the members of the Benefits Administration Committee and the benefits Investment Committee."  According to the SPD, the Monitoring Committee has the discretionary authority to remove members of the Administration Committee and the Investment Committee "at any time."

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

80.     ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plans and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.  "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996); *see also In re Unisys Corp. Retiree Medical Benefit ERISA Litig.,* 57 F.3d  1255, 1261 (3d Cir. 1995); *Fisher v. Philadelphia Elec. Co.,* 994 F.2d 130, 133 (3d Cir. 1993).

81.     Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured.  *See*, *e.g.*, *In re Unisys Corp., supra,* 994 F.2d at 133 ("a plan administrator has an affirmative duty to speak when it knows that silence might be harmful."); *see also Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir.

1993); *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002);

*Matthews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004)..

82.     During the Class Period, upon information and belief, the Company and

certain other Defendants made direct and indirect communications with the Plans'

participants including statements regarding investments in Company stock.  These

communications included, but were not limited to, SEC filings, annual reports, press

releases, and Plans documents (including Summary Plans Descriptions ("SPDs") and/or

prospectuses regarding Plans/participant holdings of Company stock), which included

and/or reiterated these statements.  Upon information and belief, at all times during the

Class Period, BNY's SEC filings were incorporated into and part of the SPDs, and/or a

prospectus and/or any applicable SEC Form S-8 registration statements.  Defendants also

acted as fiduciaries to the extent of this activity.

83.     Further, Defendants, as the Plans' fiduciaries, knew or should have known

certain basic facts about the characteristics and behavior of the Plans' participants, well-

recognized in the 401(k) literature and the trade press,[3] concerning investment in

company stock, including that:

> (a)     Employees tend to interpret a match in company stock as an
> endorsement of the company and its stock;

---

[3]   Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of
Accountancy, Vol. 204, No. 2 (August 2007) (available at:
http://www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans
Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006) (available at:
http://www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea,
*The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J.
Econ. 4, 1149 (2001) (available at:
http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott
Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plans
- the importance of plans design*, Finance and Economics Discussion Series 2002-36,
Board of Governors of the Federal Reserve System (U.S.) (available at:
http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

(b)    Out of loyalty, employees tend to invest in company stock;

(c)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)    Employees tend not to change their investment option allocations in the plans once made;

(e)    No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g)    Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

84.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plans' funds in Company stock, they still took no action to protect the Plans' assets from their imprudent investment in Company stock.

**All of the Defendants Were Co-Fiduciaries**

85.    Each defendant is liable for the breaches of fiduciary duty of the other defendants under ERISA § 405, 29 U.S.C. § 1105

## DEFENDANTS' FIDUCIARY DUTIES

86.    ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a)

**The Duty of Prudence**

87.     ERISA § 404(1)(a)(B) imposes on a plan fiduciary the duty of prudence –
that is, the duty "to discharge his duties with respect to a plan solely in the interest of the
participants and beneficiaries and … with the care, skill, prudence, and diligence under
the circumstances then prevailing that a prudent man, acting in a like capacity and
familiar with such matters would use in the conduct of an enterprise of a like character
and with like aims …."

**The Duty of Loyalty**

88.     ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to
"discharge his duties with respect to a plan solely in the interest of the participants and
beneficiaries ... for the exclusive purpose of ... providing benefits to participants and their
beneficiaries."

89.     The duty of loyalty entails a duty to avoid conflicts of interest and to
resolve them promptly when they occur.  A fiduciary must always administer a plan with
an "eye-single" to the interests of the participants and beneficiaries, regardless of any
other interests, including those of the fiduciaries themselves or the plan sponsor.

**The Duty to Disclose and Inform**

90.     The duties of loyalty and prudence include the duty to disclose and
inform.  These duties entail: (i) a duty not to misinform; (ii) an affirmative duty to inform
when the fiduciary knows or should know that silence might be harmful; and (iii) a duty
to convey complete and accurate information material to the circumstances of
participants and beneficiaries.  These duties recognize the disparity that may exist, and in

this case did exist, between the training and knowledge of the fiduciaries, on the one

hand, and the Participants, on the other.

91.     Pursuant to the duty to disclose and inform, at all relevant times, plan

fiduciaries are required under ERISA to furnish certain information to plan participants.

For example, ERISA § 101, 29 U.S.C. § 1021, requires the plan's administrator to furnish

an SPD to participants.  ERISA § 102, 29 U.S.C. § 1022, provides that the SPD and all

information contained or incorporated in it constitutes representations in a fiduciary

capacity upon which Participants are entitled to rely in determining the identity and

responsibilities of fiduciaries under the plan and in making decisions concerning their

benefits and the investment and management of plan assets allocated to their accounts.

**The Duty to Monitor Appointed Fiduciaries**

92.     Fiduciaries who have the responsibility for appointing other fiduciaries

have the further duty to monitor the fiduciaries who are appointed.  The duty to monitor

entails both giving information to and reviewing the actions of the appointed fiduciaries.

**The Duty to Investigate and Monitor Investment Alternatives**

93.     The duties of loyalty and prudence also entail a duty to conduct an

independent investigation into, and to continually monitor, the merits of the investment

alternatives in the Plan, including employer stock, to ensure that each investment is a

suitable option for the Plan.

**The Duty to Disregard Plan Documents When Necessary**

94.     A fiduciary may not avoid his fiduciary responsibilities by relying solely

on the language of the plan documents.  While the basic structure of a plan may be

specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan

document if to do so leads to an imprudent result.  ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

**SUBSTANTIVE ALLEGATIONS**

**FX Trading at BNY**

95.     The FX trading market is the largest financial market in the world, trading at approximately $3 trillion each day.  Foreign investments are bought and sold in the foreign currency of the nation in which they are issued.  As a result, United States investors have no choice but to purchase and sell those same foreign currencies in order to transact in foreign securities.  To service this need, BNY provides foreign currency exchange services to facilitate their clients' participation in international securities markets.  For each currency bought and sold, there will necessarily be a high trade and a low trade based on the daily exchange rate used to execute the trade.

96.     BNY principally offers two types of FX services: (a) negotiated FX transactions; and (b) standing instruction FX transactions.  Under a negotiated FX arrangement, the custodial client or its investment manager negotiates directly with an FX trader at BNY to buy or sell the currency at a particular price.  However, under a standing instruction FX agreement, the custodial client does not negotiate the exchange rate with BNY, but rather, BNY executes the transactions for the client automatically or on an as-needed basis at a time and price determined by BNY.  BNY's standing instructions clients have included a wide range of pension plans and federally insured financial institutions.

97.     BNY has used its standing instruction FX service to generate significant revenue.  Upon information and belief, BNY's standing instruction FX trading has been far more profitable than its negotiated FX transaction business: although standing

instructions trades have been only 20% of the Bank's FX volume, 65% to 70% of the

Bank's FX trading revenue comes from standing instruction trades.  BNY has seen its

sales margins for standing instructions foreign exchange trading total more than $1

billion since 2007

98.     BNY's practice of marking up foreign exchange purchases and marking

down foreign exchange currency sales of its clients to at, near, or beyond the boundaries

of daily trading prices of relevant foreign currencies has led to an expose by The Wall

Street Journal, and litigations including the Class Action, the Florida Action, the Virginia

Action, the New York Action, the USA Action, the SEC investigation, and presumably

other actions in other states' courts which are still under seal.  Separately and together,

these lawsuits have exposed the Company to significant losses, significant reputational

damages, and threatens the Company's future revenue

99.     Among the services provided by BNY were indirect FX trades (also

known as standing instructions), which it describes as "captur[ing] all types of custody-

related foreign exchange funding needs and automates the currency execution and

settlement." (*see https://gm.bankofny.com/FX/TradeExecution/StandingInstruction.aspx*).

BNY's website states that "Standing Instruction provide a simple, flexible, and complete

service solution that automates the capture of all types of custody-related foreign

exchange, including securities trade settlement, income conversions, corporate actions,

tax reclaims, interest postings, and residual balances." (*see https://*

*gm.bankofny.com/FX/TradeExecution/Default.aspx*).

100.    The Company touted its ability to provide "FX execution according to best

execution standards" (*see https://gm.bankofny.com/FX/TradeExecution/Standing*

*Instruction.aspx*), but was, in fact, charging clients for fees beyond those that were permitted by and negotiated for in master trust agreements.  Upon information and belief, BNY described standing instruction trades as being "operationally simple" and "free of charge" and assured clients that such transactions were subject to "best execution" standards, which required BNY to extend every effort obtain the best price for its clients. *See* Florida Complaint ¶ 20.

101.    But, according to the complaints filed in the Virginia and Florida Actions, when BNY received instructions to execute an FX trade, it would convert funds from USD into a foreign currency to complete the transaction. *See, e.g.,* Virginia Complaint ¶ 62.  However, rather than charging clients the prevailing FX rate at the time the. FX trade was executed, "[BNY] would note the low and high exchange rate of the day for the two currencies involved in the FX trade." *Id.* ¶ 63.  At the end of the trading day, BNY "ignored the price [it] paid for the FX [conversion]" and/or the market rate at the time the trade was executed; instead it charged its clients for the "FX transaction as if the trade occurred at either the high or low of the day (depending on the nature of the transaction, buy or sell), in order to charge the least favorable rate [for the client] that occurred that trading day," (*Id.* ¶ 64) keeping the difference for itself as profit.

102.    Furthermore, BNY informed standing instruction clients that (i) the prices provided for currency transactions would fall within daily ranges for each particular currency that the bank would publish each morning at 9:30 a.m. Eastern Time; (ii) the rate would not depart from the relevant Interbank rate by more than three percent; and (iii) the rate would not be less favorable to the client than the corresponding rate indicated on the daily schedule for that day

103.    In reality, "best execution standards" were not exercised by the Company, to the contrary, clients were routinely charged more than their service agreements permitted through hidden expenses.

104.    Moreover, upon information and belief, in order to conceal its actions and reap secret profits at its custodial clients' expense, BNY's account statements generally reported FX conversion rates that fell within (or close to) the high and low range for each day's FX rates but failed to provide time stamped execution prices.  The combination effectively precluded clients from discovering that the FX rates they were being charged were manipulated and were not consistent with the agreements with BNY.  This manipulation is believed to have involved a company-wide system referred to as "Charlie" (as reported by *The Wall Street Journal* on February 4, 2011) and required telephonic coordination made on a private, direct line that may have been shielded from the Company's customary policy of recording transactional conversations.  Florida Complaint ¶ 49.

105.    Furthermore, BNY's standing instruction FX service was not "free of charge," as BNY represented.  In fact, when a BNY standing instruction FX client purchased currency, the bank charged the client based on an exchange rate significantly higher than the actual rate at which BNY was required to pay in executing the purchase.  In contrast, when a standing instruction FX client sold a currency, the bank gave the client an exchange rate significantly lower than the actual rate at the time of the currency transfer referred to that sale.  Under both scenarios, BNY knowingly manipulated the purchase and sale exchange rates to give the client the worst price of the day.

106.     Specifically, BNY would look for the points in each trading day during which the exchange rate was at its highest and its lowest and would report to its clients that BNY had received a rate for the clients' FX sales at one of the lowest prices in that range.  In reality, however, BNY would obtain an exchange rate on that sale on one of the highest prices in that range, and unbeknownst to clients, BNY would pocket the difference between those prices.

107.     Contrary to what BNY's custodial clients would have known, BNY's foreign exchange traders rarely, if ever, charged the foreign exchange rate actually obtained by BNY at the time of a trade to its custodial banking clients.  Instead, the foreign exchange trade orders were generally filled once a day out of BNY's "inventory" of currencies, and BNY assigned the rates that it ultimately reported to, and charged or credited its standing-instruction foreign exchange trade clients

108.     To conceal this practice, BNY did not disclose that standing instruction clients always received nearly the worst possible rate within the range on the daily schedule.  If clients were aware of this practice, they would not have given their standing instruction business to BNY.  Upon completion of a standing instruction trade, the only pricing information provided to the client by BNY would be the final exchange rate obtained.  No time stamp would be provided for the trade, thereby preventing clients from verifying whether they had received a fair rate.

109.     That the Company's foreign exchange practices had a significant impact on the Company is also indisputable.  The Company's foreign-exchange revenue has been significant, as demonstrated by *The Wall Street Journal* on May 23, 2011.  But that foreign-exchange revenue came at the expense of, *inter alia,* deceiving customers which

was likely to and did result in lost business, reputational damage and lost business, high litigation costs, BNY likely disgorgement, and probable civil and criminal penalties.

110.    As the Company recognized in its Form 10-K, for the year ended December 31, 2008 ("2008 Form 10-K"), and in its subsequent 10-Ks, "[m]ost of our foreign exchange revenue is derived from our securities servicing client base."

111.    BNY's foreign exchange and other trading revenue constituted a material portion of its revenue, approximately 10% from 2008 to 2010.  According to BNY's 2010 Form 10-K, BNY generated $886 million in "foreign exchange and other trading revenue" in 2010. Additionally, BNY's Form 10-K for the year ended December 31, 2009 ("2009 Form 10-K") states that BNY generated $1.46 billion and $1.036 billion in FX and other trading revenue in 2008 and 2009, respectively.  In short, hundreds of millions of dollars in unwarranted profits were generated by the Company's pricing scheme, and Defendants are believed to have profited therefrom because, as noted in the 2010 10 K, the Company's incentive expenses, which were $1.193 billion in 2010, $996 million in 2009, and $1.247 billion in 2008 includes "additional compensation earned under a wide range of sales commission and incentive plans designed to reward a combination of individual, business unit and corporate performance goals[.]"

**Internal BNY Documents Show That Senior Management Was Aware of and Encouraged this Deceptive Scheme**

112.    Internal BNY communications demonstrate that high-ranking members of BNY management were aware of the deceptive standing-instruction foreign exchange trading scheme, and of its importance to the profitability of the Bank.  Indeed, these communications show high-ranking BNY officers who were not only aware of the

deceptive scheme, but who openly supported it, and its purpose to profit from the lack of knowledge of the Bank's customers.

113.    On February 8, 2008, Jorge Rodriguez, BNY's Executive Vice President of Global Sales and a Managing Director at the Bank's New York City offices, e-mailed the Bank's Executive Vice President of Global Markets, Richard Mahoney, and a number of other high-ranking New York City-based BNY executives.  In that e-mail. Mr. Rodriguez warned that BNY would lose its "pricing advantages" if its banking clients, no longer agreed to, and migrated away from, "standing -instruction" trading:

(a)    Mr. Rodriguez explained to his fellow BNY executives that "Standing instruction FX is *the most profitable form of* business."

(b)    Mr. Rodriguez further highlighted the bank's "free intra-day option to *time its currency execution* in the marketplace knowing it *does not have to get back to the customer immediately* with the deal price."

(c)    Custodial banking services "of this type," he continued, "also allow [us] to take advantage of increased market volatility and wide intra-day trading ranges. All these *pricing advantages disappear when a client trades via an e-commerce platform and full transparency is achieved."*

(d)    Mr. Rodriguez concluded by noting that when these "*ultra friendly"* clients decide not to utilize BNY's standing-instruction FX trading service, "margins greatly decline as the free intra-day option feature previously enjoyed disappears ... and *the client's ability to carefully monitor each and every trade at the time of execution reduces margins dramatically."* (Emphasis added.)

114.    As this correspondence demonstrates, BNY senior management knew, and approved of, foreign exchange traders' assignment of optimum prices to present to its clients, to inappropriately and deceptively maximize the Bank's own profits. Indeed, the email acknowledges that if custodial banking clients were presented accurate information (*i.e.,* "full transparency"), the Bank's profitability would suffer.

115.    This internal awareness, and approval, continued well past October 2009, when the California Attorney General intervened in the *California v. State Street.* Specifically, as late as July 2010, BNY management admitted in internal communications that the Bank was still not transparent in what it reported to its custodial banking clients regarding the actual pricing of foreign exchange trades.  Additionally, these communications demonstrate management's belief that this lack of transparency was a leading cause of BNY's profitability.

116.    In fact, on July 21, 2010, Robert Near, Managing Director and head of North American Foreign Exchange Sales, emailed Mr. Rodriguez and others, informing them that in the months following the revelations of *California v. Slate Street,* BNY "has been more successful in maintaining spreads in the [standing-instruction] space compared to these peers (State Street and Northern Trust).  Another way to say this is [BNY] is 'late' to the transparency space. We are hearing from our clients that our competitors are offering time stamping and fixed spreads across all currencies."

**BNY Publicly Represented that Standing-Instruction Foreign Exchange Trading Was Free of Charge**

117.    As part of its deception, BNY also marketed and represented through its website and other marketing materials the various foreign exchange services offered to its standing-instruction foreign exchange trade custodial clients:

> (a)    Standing Instruction [FX] trading provides a simple, flexible, and complete service solution that automates the capture of all types of custody-related foreign exchange ... Operationally *simple, free of charge* and integrated with the client's activity on the various securities markets, FX standing instruction [trading] is designed to help clients minimize risks and costs related to the foreign exchange and concentrate on their core *business.*"

(b)    "Standing Instruction Foreign Exchange Clients benefit from: execution according to *best execution standards* ..."

118.    As described above, BNY's representations had little or nothing to do with its actual practices.  Nothing in these public representations came close to revealing the truth regarding BNY's deceptive foreign exchange trading practices, whereby it assigned rates for standing-instruction trades that always, and without disclosure, maximized the BNY's income at Plaintiffs and Plan Participants expense.  Moreover, after the *California v. State Street* case was announced, the language of the webpage was changed, so that no reference to "free of charge" standing-instruction foreign exchange trading remained.

**BNY's False And Misleading Statements and Omissions**

119.    Throughout the Class Period, BNY and its officers and directors repeatedly issued materially inaccurate statements and omissions that misrepresented and failed to disclose that BNY had engaged and was engaging in a systematic business practice of overcharging clients in standing instruction FX transactions.  Although BNY represented that the foreign exchange rates it was using for its standing instruction services constituted the best and most competitive rates available, BNY engaged in a secret price-fixing scheme through which it purposely gave clients the least favorable rates so that BNY could realize large profits on those trades.  For example, if a client sought to purchase a certain currency, BNY would take the order, make a spot trade at the most preferential rate possible, tell the client that the bank had obtained a much worse rate on the exchange, and then pocket the spread.

120.    As a result of BNY's deceptive practices, the Company realized profits at the expense of investors while reporting increased FX trading revenue and growth in Asset Servicing throughout the Class Period.  Consequently, BNY and its officers and

directors misled the public and the Participants regarding the true nature of BNY's business practices and its overall financial health. As a further consequence, shares of BNY common stock traded at artificially inflated prices during the Class Period.

121. In an October 18, 2007 press release attached the Company's 8-K BNY reported FX trading and "other trading" revenue of $238 million for third quarter 2007, up 74% year over year reflecting "higher client volumes, as well as a significant increase in currency volatility and a higher valuation of the credit derivatives portfolio."

122. Also on October 18, 2007, BNY held a 2007 earnings conference call, during which certain officers and directors of BNY made the following statements:

> Gerald I. Hassell, [President and director of BNY]:
>
> Our integration is on track, and at the same time we are posting strong growth in all of our businesses…. Securities servicing fees in the aggregate were up 31% year-over-year, *led by asset servicing*…
>
> I know an area of great interest to you is *asset servicing*. There have been a few skeptics out there who wondered whether we could go through an integration and simultaneously grow our business. *While the marketplace and our clients are responding very favorably to our new company's offering and the excellent service we are providing them*, we have won 41 of 82 publicly announced new business wins in January through June, equaling the total of all competitors combined.
>
> Bruce W. Van Saun – [BNY's] Chief Financial Officer:
>
> *FX and other trading showed excellent growth year-over-year and sequentially*. *FX volatility and volumes were way up given the market conditions, and we capitalized*. [Emphasis Added.]

123. On January 17, 2008, BNY reported FX trading and "other trading" revenue of $305 million, up 97% from the same period of 2006. In the press release

appended to that Form 8-K filed, BNY described the fourth quarter increase in FX trading revenue as reflecting, "higher client volumes, a significant increase in currency volatility, as well as a higher valuation of the credit derivatives portfolio."

124.    On January 17, 2008, BNY held a fourth quarter 2007 earnings conference call, during which certain officers and directors of BNY made the following statements:

> Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:
>
> … [CFO] Bruce [W. Van Saun] is going to provide greater details into the numbers as well as our excellent progress integrating our two legacy companies.  But first I'm going to ask Gerald to make some more specific comments about our revenue momentum **and some continued good news regarding the performance of our asset servicing business**.  Gerald?
>
> Gerald I. Hassell, [President and director of BNY]:
>
> Thanks Bob.  We've now delivered two strong quarters across all of our businesses, a great start for our new company.  We're winning new business, we're retaining our client, pipelines are in excellent shape and **we're delivering on our commitment to service quality**.  We are experiencing momentum all around going into 2008. **For 2007, security servicing and asset management fees, our major sources of revenue, each enjoyed strong growth over the year ago quarter.**  Asset and wealth management fees were up 14% year over year and **security servicing fees were up 26% year over year led by asset servicing, which had an outstanding fourth quarter.  Total revenues in this sector were up 42% with fees up 37%, FX and trading income up 89% and net interest revenue up 46%. These results compare quite favorably to our peer group and were powered not only by market volatility but also by increased client activity, deposit flows and of course excellent new business results.**
>
> ***
>
> **In asset servicing we are particularly mindful of how we are performing given the integration that we're going**

*through.  I'm very pleased to report that in a recently released global custodian survey our new combined company received nine operated awards in key categories and 130 best in class awards which is more than any other service provider.*

*We're off to a great start to achieve our goal of number one rankings in all the major industry surveys and we're going to continue to work hard on delivering great service to our clients … And our FX and securities lending [inaudible] have come together quite nicely adopting a number of best practices and achieving good synergies.*

Bruce Van Saun:

*FX and other trading had a stellar quarter up 97% year over year and 28% sequentially reflecting market volatility and volumes as well as an increase in value in our credit derivatives portfolio given credit spread widening.*

I'm going to conclude my remarks by offering a few observations about the coming year. We are confident of momentum and positioning of our franchise as we enter '08.  *In terms of how to think about us going forward, our servicing businesses are over earning their trend line today given market volumes and volatility particularly in securities lending, FX and net interest income.*  A key question for 2008 is how long will these favorable conditions last. That's a tough one but what I can tell you is that the variable that we can control such as service quality and net new business continue to be in great shape.

*** 

James Palermo, [BNY officer and member of BNY's Executive Committee]:

Brian what we've seen is we're able to accomplish in the latter half of '07 was actually consolidating both the [inaudible] so I think we've realized the synergy components of that and now we're actually through the balance of '08 and I think it'll be in the September, October time frame, we're working on the applications being integrated as well. So we'll get a little bit of a positive impact at that point. *But in terms of the best practices from a trading and lending perspective, those are already pretty*

*much in the run rate.* [Emphasis Added.]

125.    On February 28, 2008, BNY filed its Form 10-K with the SEC for the fiscal year 2007, reporting asset servicing revenue of $2.350 billion and stating:

> *Foreign exchange and other trading activities revenue, which is primarily reported in the Asset Servicing segment, was $786 million in 2007, an increase of $371 million, or 89%, compared with 2006.* [Emphasis Added.]

126.    On April 18, 2008, in a press release containing the byline, "Strong growth in Asset Servicing – Significant operating leverage – Integration continues on track" appended to the Form 8-K filed with the SEC, BNY reported FX trading and "other trading" revenue of $259 million for the first quarter of 2008.  In highlighting the fact that this number was 42% year over year increase, BNY announced that:

> "*Our businesses are performing well in a tough environment*.  We generated 14% revenue growth compared to the first quarter of 2007, significant positive operating leverage and 16% EPS growth. Market volumes and volatility, together with new business wins, *continued to favor our asset servicing* and clearing businesses, while lower market values impacted our asset management business …," said Robert P. Kelly, chief executive officer of The Bank of New York Mellon. [Emphasis Added.]

127.    That same day, BNY held a first quarter 2008 earnings conference call, during which certain officers and directors of BNY made the following statements:

> Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:
>
> "You should assume that we will continue to sharpen our focus in the coming quarters.  *One of the fundamental commitments we've made to our clients is industry leading client service around the world in all of our businesses.  I'm delighted to advise that there's further*

*evidence we're succeeding on that front and most notably in asset servicing.*

Last quarter we told you about our number one performance in the global custodian survey. ***This quarter the results of the R&M global survey were released and we were again ranked number one amongst the world's largest global custodians. So we're consistently achieving our goal of outperforming our peers.  Our success on the quality front is also paying off.  In asset servicing during the quarter we won approximately $350 billion in new assets.  This represents 60% success rates on the deals we bid on. In asset servicing our pipeline remains strong, up over the prior quarter and this time last year and we again exceeded client retention goals with a rate now well in excess of 99%.*** [Emphasis Added.]

*\*\*\**

Ken Usdin – Bank of America Securities:

Can you give us anecdotes or are there tangible revenue synergies in this quarter?

Gerald I. Hassell, [President and director of BNY]:

***They're very similar to the ones we've seen in the past and that is greater use and greater trading capabilities in our SEC lending and foreign exchange areas***.  Money market flows out of areas like Pershing and our corporate trust areas into Dreyfus, cross selling of asset management into our asset servicing clients.  Those are the three main areas that continue to perform quite well.

*\*\*\**

Bruce Van Saun:

Yeah I think Tom given the uncertainty out there, that's a little hard one to call.  ***You know what I think we're trying to describe the framework is that you know asset servicing has really been off the charts and the comps will get tougher for asset servicing as we go through the year.*** [Emphasis Added.]

128.    On June 17, 2008, BNY hosted its 2008 Investor Conference, during

which B. Kelly provided a presentation with a slide entitled "Strengths: Our Values and

Behaviors", which highlighted BNY's pitch to investors that a fundamental part of

BNY's strategy was to present a trustworthy brand of impeccable integrity.  That

presentation slide pledged, among other things, that "[BNY] will be proactive and treat

our clients as partners," that "[BNY] will put ourselves in the client's shoes," that BNY

would act "with the highest standards of integrity and openness to ensure the trust of

those we serve," that "[BNY] will be open and honest", that "[BNY] will operate with

integrity," that "[BNY] will conduct business with the highest ethical standards," that

"[BNY] will be mindful of our actions," and that "[BNY] will be responsible members of

our communities."

129.    On July 17, 2008, BNY reported asset servicing revenues of $868 million,

up 25% year over year, driven in part by FX trading and "other trading" revenue of $308

million for the second quarter.  On BNY's balance sheet for the quarter, BNY reported a

75% year over year increase in FX trading and "other trading" revenue.

130.    Also on July 17, 2008, BNY conducted a second quarter 2008 earnings

conference call, during which certain BNY officers and directors made the following

statements:

> Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:
>
> We are winning a lot of new business. Net asset flows were plus $13 billion during the quarter.  *New Asset Servicing wins were $600 billion*. …  *We are delivering great service.  We won recognition for service quality in Asset Servicing, corporate trust, collateral management and transition management*.
>
> Todd Gibbons:
>
> Now, my comments going forward will focus on our core

business excluding the SILO charge. **Our three largest businesses, Asset Management, Asset Servicing and Issuer Services continued to capitalize on the faster growing global markets, as each generated in excess of 40% of their revenues outside of the US**.

***

… **Traditionally, the third quarter is impacted by seasonality associated with lower levels of capital markets related revenues, particularly securities lending and foreign exchange. However, given the ongoing volatility in the markets we may see better than historical trend in some our businesses including foreign exchange.**

***

Gerald I. Hassell, [President and director of BNY]:

**Ken, I think a good example on the revenue synergy side would be an area like foreign exchange where the combined book continues to perform very well, and I would suggest we maybe out performing our peers in some of the categories because of the revenue synergy associated with combining the books.** That's a great example where we are pulling through, they just showing up in existing revenues, how those synergies are coming together. Some of the other revenue synergies are around the asset gathering capabilities, some of which are showing up in Pershing's numbers, some of which are showing up in Asset Management numbers. So we are tracking it, we are on or ahead of schedule of what we updated you on in the investor conference and feel very good about the continued opportunities going forward.

***

Todd Gibbons:

Yeah, Mark, I'll take it. It's Todd Gibbons. **Almost all of the head count increases that you are seeing are really related to growth in our Asset Servicing businesses.** And I'll let Jim and Tim speak to that in a moment. But we are on track to manage to the numbers that we've given to you. So I think any growth that you are seeing is just the growth in the underlying businesses and I don't know Jim or Tim if you want to add something to that? [Emphasis Added.]

42

131.   On September 10, 2008, B. Kelly gave a presentation at the Lehman Financial Services Conference.  In the presentation, BNY conveyed to investors that client service and satisfaction was a fundamental part of its success and strategy for growth: in a slide labeled "Industry Leading Client Service Globally: Foundation for Revenue Growth" which noted that BNY was the number one ranked asset servicing provider in various customer surveys.[4]

132.   On October 16, 2008, BNY reported "**record**" FX trading and "other trading" revenue of $385 million, and highlighted the fact that the number was up 62% year over year in the 8-k announcing third quarter results.  [Emphasis Added.]

133.   That same day, on BNY's third quarter 2008 earnings conference call, certain officers and directors of BNY made the following statements:

Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:

… ***Our operating performance exceeded expectations. It was driven by*** the diversity of our six security servicing ***and asset management businesses plus*** the impact of market volatility.

\*\*\*

We now have $82 billion in non-interest bearing deposits, up $50 billion this year and clearly that would help NII as well.  ***Market volatility resulted in record levels of foreign exchange and trading revenue based upon client volumes and activity.***

Thomas P. Gibbons:

***Fee revenue was strong in security servicing and even***

---

[4]  This slide was included in numerous investor presentations by BNY thereafter, including: at the Merrill Lynch 2008 Banking & Financial Services Conference on November 11, 2008; at the Citi Financial Services Conference on January 28, 2009; Barclays Financial Services Conference on May 6, 2009; and Barclays Capital 2009 Global Financial Services Conference on September 16, 2009, among others.

*more so in foreign exchange and other trading*.

\*\*\*

*FX and other trading revenue generated extremely strong growth of 62% year-over-year and 25% sequentially.* We benefited from higher levels of currency volatility and client volumes relative to both periods as well as the higher value of our portfolio credit default swaps which we used to hedge certain loan exposures.

\*\*\*

I'm going to conclude my remarks by offering a few observations about the fourth quarter. *Given the ongoing volatility in the markets, we may continue to see better than historical trend performance in foreign exchange, net interest revenue and securities lending.* Weak equity markets will continue to impact asset management and performance fees. We will continue to manage expense growth especially carefully. [Emphasis Added.]

134.    On January 20, 2009, BNY reported that during the fourth quarter of 2008, while numerous large American financial institutions collapsing, BNY had made $782 million in asset servicing fee revenue, comprised in large part of "**record**" FX and "other trading" revenue of $510 million, up 67% year over year. [Emphasis Added.]

135.    That same day, BNY conducted a fourth quarter 2009 earnings conference call, during which certain officers and directors made the following statements:

> Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:
>
> Frankly it's pretty good to see 2008 in the rear view mirror now. We generated a profit every quarter including in the fourth quarter. We had record levels of revenue in our institutional servicing businesses in Q4. *We had outstanding results in foreign exchange and net interest income.*
>
> *We enjoyed a flight to quality in deposits, wide spreads in net interest income and we enjoyed volatility in the*

> *foreign exchange markets which really helped those revenues.*
>
> ***
>
> Todd Gibbons:
>
> *Volatility was also a key driver for us.  We gauge volatility based on a basket of the 30 major currencies and during the quarter exchange rates were extremely volatile and combined with increased market share we enjoyed a record quarter for our foreign exchange business.*
> [Emphasis Added.]

136.    On February 27, 2009, BNY filed a Form 10-K with the SEC reporting its financial results for the fiscal year 2008.  The Form 10-K reported $1.462 billion in fee revenue from FX trading and "other trading," up 86%, or $540 million, compared to the fiscal year 2007.  For the year 2008, FX reported asset servicing revenue of $3.3 billion.

137.    On April 21, 2009, BNY reported FX trading and "other trading" revenue of $309 million for the first quarter, and highlighted the fact that this number was up 19% year over year, the financial crisis notwithstanding.

138.    Also on April 21, 2009, BNY held its first quarter 2009 earnings conference call, during which certain officers and directors made the following statements:

> Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:
>
> *In Q1, interbank lending spreads declined, deposit levels had finally started to moderate and volatility has come down in FX.*
>
> ***
>
> In wealth management, we had our 13th consecutive quarter of net positive claim assets flows.  *In asset servicing, we posted strong new business wins.  Over the*

> *past year, we won $1.9 trillion in assets in new assets*
> *under custody and that's over $300 billion in the most*
> *recent quarter.*
>
>       \*\*\*
>
> Todd Gibbons:
>
> *FX and other trading revenue increased 19% year-over-*
> *year*, and it actually declined 40% sequentially.  The
> increase from the year-over-year quarter reflects the benefit
> from higher volatility of key currencies, partially offset by
> lower client volumes.  The decrease from the record fourth
> quarter reflects the impact of both lower volatility and
> client volumes.  With approximately 85% of the FX
> revenue driven by our securities servicing clients, lower
> volume and values negatively impacted trading revenue.
>
> *We were pleased once again, however, to be recognized*
> *for our quality service in the Global Investor magazine,*
> *FX Survey, who rated the number one FX provider, and*
> *we won Best FX Service Overall.*
>
>       \*\*\*
>
> On a possible note [sic], *in asset servicing for the second*
> *year in a row, we ranked number one among all Global*
> *Custodians in the R&M Survey, and we now have the*
> *number one quality ranking across all three major*
> *custody surveys.* [Emphasis Added.]

139. On July 22, 2009, BNY filed a Form 8-K with the SEC announcing its

financial results for the second quarter of 2009 and reporting that FX trading and "other

trading" revenue was down 23% to $239 million.  During its second quarter 2009

earnings conference call, BNY confirmed that "FX and other trading revenue decreased

23% both sequentially and year over year."  In explaining the cause of the decrease in FX

trading revenue during BNY's second quarter 2009 earnings conference call, BNY

claimed, in pertinent part, that "[t]raditionally, third quarter earnings are negatively

impacted by seasonality associated with lower levels of capital markets related revenues,

particularly securities lending and foreign exchange.  We expect net interest revenue to

remain at current low levels because of the global rate environment.  However, we continue to see some positive indicators for our business model."

140.    On October 20, 2009, BNY reported FX and "other trading" revenue of $246 million, down 36% year over year for the third quarter.  During its October 20, 2009 third quarter earnings conference call, R. Kelly explained the decrease in FX revenue as follows:

> *FX and other trading revenue increased 4% sequentially, reflecting strength and fixed income derivatives trading and a smaller loss in credit to both swap hedges, partially offset by lower foreign exchange revenue driven by lower volatility and seasonality*.  The year-over-year decrease of 36% reflects lower foreign exchange revenues driven by lower volumes and volatility as well as a lower evaluation of the credit derivatives portfolio used to hedge the loan portfolio. [Emphasis Added.]

141.    On January 20, 2010, R. Kelly made the following statements with respect to BNY's asset management services during the fourth quarter 2009 earnings conference call:

> Several of our core businesses are showing some improvement with a particular strong quarter in asset management.  However, the persistently low interest rate environment around the world continues to challenge our net interest revenue and also impacts fee revenue due to fee waivers that are pretty substantial in our company….
>
> *Fee revenue was actually up 2% versus the prior quarter excluding the net impact of third quarter asset sales.  We had excellent growth in assets in wealth management fees*. They were up 13%.  We had net long-term asset flows of $14 billion which was the biggest increase since 2006 and performance fees were up $58 million.  *Our security servicing fees excluding tech lending revenue was actually up 1% led by core fees in asset servicing as well as in issuer services*. [Emphasis Added.]

142.    On April 20, 2010, BNY conducted its first quarter 2010 earnings conference call, during which certain officers and directors of BNY made the following statements:

> Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:
>
> ***Service levels remain very strong.  The last annual R&M survey of custody clients and fund managers BNY Mellon Asset Servicing was ranked number one overall in six key categories and ahead of our peer group in a further seven categories.  In Global Investor Magazine's annual FX survey we were ranked number one in 25 categories including four overall performance categories and 14 of the 20 service categories.  This is the third consecutive year in which we have essentially dominated this survey***.
>
> ***
>
> Todd Gibbons:
>
> ***FX and other trading revenue was up 7% sequentially reflecting higher fixed income trading revenue*** and lower mark to market adjustments on credit default swaps that we used to hedge the loan portfolio.
>
> Investment and other income was driven by above trend gains on continuing dispositions of the lease assets and a ***positive FX valuation for the quarter.***  [Emphasis Added.]

143.    On July 20, 2010, BNY conducted its second quarter 2010 earnings conference call, during which certain officers and directors of BNY made the following statements:

> Todd Gibbons:
>
> Let me isolate a few key data points on a sequential basis.  First of all, we earned $0.55 for the quarter on both a reported and operating basis.  ***Fee revenue benefited from a 6% increase in security servicing fees, and a 39% increase in foreign exchange.***

***

*FX revenue of $244 million was up 39% sequentially, on higher volatility.*

***

Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:

Okay. Let me start with the trading revenue. There are really three drivers of what -- I mean, let us start with FX, FX with strong volumes were pretty good. Obviously volatility was up, and we saw the 39% increase. [Emphasis Added.]

144.     On April 19, 2011, BNY conducted its first quarter 2011 earnings conference call, during which certain officers and directors of BNY made the following statements:

Alexander Blostein - Goldman Sachs Group Inc.:

Okay, that's helpful. And then maybe just one more follow-up on FX. *Is there a way for us to -- for you guys to size for us how much of your FX business comes from really standby -- standing instructions versus negotiated trades, just to get -- to help us kind of size that bucket that -- obviously it's been a lot in the press?*

J. Jeffrey Hopson - Stifel, Nicolaus & Co., Inc.:

Just a question on pricing. *If there's more, I guess, scrutiny of FX rates, et cetera, it's maybe limited your ability to get full pricing. So in terms of the pricing environment, with rates low, how do we know, I guess, that you're getting the appropriate -- how are you getting the appropriate pricing for the new business that's coming in the door?*

***

Unknown Analyst:

Okay. *If I could follow up with a question on FX.*

49

*Historically, that's been one of your highest margin businesses. With what's going on, should we expect the pretax margin on that business to come down towards sort of the level of the rest of the firm?*

Thomas Gibbons:

*I would say it's probably early to tell. Right now, our behaviors and the revenues are consistent with the drivers that we've seen historically. Given the increased attention, we would expect the competitiveness of FX to -- it's been competitive. It will continue to be competitive. And there is some potential there for margin compression. It's unfortunate. I can't deny that, but I think we are in the process of taking a number of actions to increase, for example, the volumes that is done with us to mitigate that. Right now, 75% of the transactions, FX transactions that our clients execute are done away from us. So there's a real opportunity for us to capture more of that business that's done away. In terms of the operating margin on FX, the actual standing instructions have higher costs associated with them.* So I don't think the margin implication is going to be that high. Jim, do you have anything to add to that?

James Palermo:

Yes, I completely agree with you, ***Todd, that likely going forward, the heightened awareness will add to the competitive nature that we're seeing.*** But there's a lot of opportunity there, and in our discussions, as I said, that we had just last week with our clients, they're very supportive of the approach that we've taken. And they're even more supportive of some of the technology enhancements that we're about to embark upon. And so our expectation is that we will catch more of that flow. [Emphasis Added.]

145.    On July 19, 2011, BNY conducted its third quarter 2010 earnings conference call, during which certain officers and directors of BNY made the following statements:

Todd Gibbons:

> ***Investment management had another strong quarter.***
> Higher market values, net new business was partially offset
> once again by higher money market fee waivers.  ***FX and
> other trading was up slightly both year-over-year and
> sequentially.***  FX revenue totaled $184 million, a decrease
> of 25% year-over-year, reflecting lower volatility, partially
> offset by higher volumes.   FX revenue was up 6%
> sequentially, reflecting higher volatility.   [Emphasis
> Added.]

146.   All of the foregoing statements to investors were materially inaccurate,

contained material omissions, or were misrepresentations.  Throughout the Class Period,

defendants touted Asset Servicing revenues and FX trading revenues as a significant

driver of BNY's financial performance when an overwhelming factor in those revenues

was fee income derived from BNY's improper practice of overcharging investors in

standing instruction FX transactions.  As a consequence, shares of BNY common stock

traded at artificially inflated prices throughout the Class Period.

**BNY Exposed**

147.   In February 2011, BlackRock, Inc., concerned that BNY had been

overcharging some of its clients in connection with standing instruction FX trades, began

an internal investigation and altered the way that it traded currencies in order to avoid the

standing instruction fee practices used at BNY.

148.   Also in February 2011, the media reported that the Attorneys General of

Virginia and Florida would be suing BNY over its standing instruction fee practices of

defrauding investors and pension funds out of foreign exchange fees.

149.   On January 19, 2011, FX Analytics served the Virginia Attorney General

with a copy of its First Amended Complaint filed under seal in Virginia Circuit Court on

behalf of the Commonwealth of Virginia against BNY.  The document, subsequently

unsealed, captioned *Commonwealth of Virginia, ex rel. FX Analytics v. The Bank of New York Mellon*, stated substantially similar allegations to those contained herein and accused BNY of violating Virginia law by knowingly submitting false claims for payment to an employee of the Commonwealth, using of false records to obtain payment from the Commonwealth, and related counts.

150.    On February 3, 2011, the Attorney General of Florida filed a notice intervening in the FX Analytics case against BNY.  On February 5, 2011, the *Miami Herald* published an article titled "Florida: Did Bank Rob Us?" reporting:

> Attorney General Pam Bondi plans to take over a whistle-blowers' lawsuit alleging that the Bank of New York Mellon defrauded Florida's pension fund with the secret markup on billions of dollars, collecting a higher currency-conversion price than it actually got and pocketing the difference.  The whistle-blowers filed a similar lawsuit in Virginia.

151.    On February 4, 2011, the Attorney General of Virginia solicited requests from law firms seeking to be appointed special counsel to represent the Commonwealth of Virginia in prosecuting the case against BNY.

152.    Meanwhile, in October 2009, whistleblower lawsuits against BNY were filed under seal in New York, Virginia, and Florida by a plaintiff called FX Analytics, a Delaware partnership being used to shield the identities of the whistleblowers.  Although the specific allegations were not public because the cases were filed under seal, at least one of the FX Analytics complaints has since been unsealed.

153.    On April 5, 2010, FX Analytics brought a whistleblower lawsuit against BNY on behalf of 10 pension funds filed under seal in the Superior Court of the State of California for violations of the California State False Claims Act, Cal. Gov. Code §

12651, *et seg*.  The second amended complaint, subsequently unsealed, captioned *In re Bank of New York Mellon Corporation False Claims Act Foreign Exchange Litigation, Ex rel. FX Analytics*, *Commonwealth of Virginia, ex rel. FX Analytics v. The Bank of New York Mellon*, stated substantially similar allegations to those contained herein and accused BNY of violating the California State False Claims Act by assigning fictitious FX rates to pension funds' purchases and sales of foreign securities, making false statements and creating false records related thereto, and conspiring to commit those offenses.  The action alleges that BNY knowingly and intentionally created and carried out a fraudulent scheme in which BNY charged the ten pension funds fictitious FX rates that were not the FX rates at which BNY actually executed requested FX transactions for the funds.  As the lawsuit alleges, this FX trading scheme dates back at least ten years, affects institutional investors nationwide, and currently yields an estimated $500 million annually to BNY.

154.    On August 11, 2011, the State of Florida filed a Complaint in Intervention in Florida Circuit Court in the matter of *State of Florida ex rel. v. The Bank of New York Mellon*, alleging three counts of fraud in connection with substantially similar FX trading practices by BNY.

155.    Also on August 11, 2011, the Commonwealth of Virginia filed a Complaint in Intervention in the FX Analytics case against BNY seeking approximately $931 million and alleging that BNY knowingly deceived its custodial banking clients about its standing instruction practices and that BNY violated the Virginia Fraud Against Taxpayers Act.

156.    On August 31, 2011, amidst the steep decline of BNY's stock price and the multitude of attorneys general and whistleblower suits brought against BNY, a *Bloomberg.com* news article reported that R. Kelley was replaced "after a dispute with directors over the way he ran the company."

157.    On October 4, 2011, the Attorney General of New York filed a complaint in New York State Supreme Court, captioned *State of New York, ex rel. FX Analytics v. The Bank of New York Mellon Corporation*, stating claims on 13 counts related to BNY's standing instruction practices including: securities fraud, affirmative misrepresentations, "persistent fraud or illegality," violations of the New York State False Claims Act, unjust enrichment, common law fraud, breach of fiduciary duty, and breach of contract. According to the New York Attorney General, Eric T. Schneiderman, BNY "consistently overcharged customers for processing foreign exchange transactions."  The New York Attorney General's suit seeks recovery about $2 billion, which are the ill-gotten profits that BNY generated over the last decade through its standing instruction services.

158.    Also on October 4, 2011, the United States Attorney for the Southern District of New York filed a complaint in the United States District Court for the Southern District of New York reportedly seeking hundreds of millions of dollars, captioned *United States of America v. The Bank of New York Mellon Corporation*, stating claims in connection with the standing instruction practices under the Financial Institutions Reform, Recovery, and Enforcement Act for civil penalties and an injunction against BNY's "ongoing fraudulent pricing scheme."

159.    On October 12, 2011, a *Wall Street Journal* article entitled "Secret Informant Surfaces in BNY Currency Probe" reported that Grant Wilson, a former BNY

trader located in Pittsburgh, had become a secret whistleblower assisting currency-trading investigations of BNY's standing instruction FX trading services.  Unbeknownst to BNY, Mr. Wilson had been a secret whistleblower for the past two years where he worked on a BNY trading desk, buying and selling currencies for BNY, where he has "extensive personal contact with the employees and executives" behind the alleged scheme. investment of the Plans' assets in Company stock even as BNY's problems came to light.

160.    Mr. Wilson informed law-enforcement officials how the alleged scheme worked at BNY and provided internal documents showing BNY's profits.  According to the *Wall Street Journal* article, "a separate 'transaction desk' was responsible for collecting the currency trades made for the bank's 'standing instruction' clients and then setting the price at which the bank would record those transactions.  The prices often were at or near the day's least favorable exchange rates, states attorneys general and prosecutors allege, with the bank profiting from the difference."

161.    State attorneys generally allege that "emails and internal communications from [BNY] show executives endorsing the alleged currency-transaction practice, favoring clients with better pricing, and worrying that profit margins would fall if the bank were more transparent."  In fact, BNY is alleged to have "cherry-picked the least-favorable rates for pension funds."

162.    Mr. Wilson's input culminated with the filing of the October 4, 2011 lawsuits against BNY by the Justice Department and New York attorney general.  Using specific information provided by Mr. Wilson, the suits filed against BNY in Virginia and Florida were able to identify "specific amounts of standing-instruction trades – $5.375 billion – that had been processed through a Pittsburgh desk in July 2009."

163.     Moreover, on October 26, 2011, the Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts filed an action against BNY for violating the Massachusetts Uniform Securities Act.  According to that action, BNY's scheme to deceive its clients by misleading and omitting critical information with respect to its FX standing instruction service was perpetuated over a minimum of ten years and garnered tens of millions in illegal profits for BNY."

164.     As details publicly emerged about BNY's fraudulent FX trading scheme, BNY's stock price plummeted 62% from a Class Period trading high of $49.40 per share on January 3, 2008 to a closing price of $18.97 per share on October 14, 2011, a price which is significantly less than the price at which the Plan and its participants were acquiring the stock during the Class Period.  In reporting on the August 31, 2011 news that BNY had replaced R. Kelly as a director, Chief Executive, and Chairman of the Board, Gerard Cassidy, an analyst as RBC Capital Markets explained that, "[t]he stock price is the ultimate measure of a CEO's job, and the stock hasn't done well."

**Defendants Knew Or Should Have Known That BNY Stock Was An Imprudent Investment For The Plans**

165.     At all relevant times, defendants knew or should have known that BNY was engaging in the practice of overcharging its clients for processing FX transactions pursuant to standing instructions by failing to give those clients the best available exchange rates, which made BNY common stock an imprudent investment for the Plan.

166.     However, defendants, as fiduciaries of the Plan, failed properly to take into account BNY's improper FX trading practices which put BNY stock at risk when

determining the prudence of investing and holding the Plan's assets in the BNY Stock Fund.

167.    As a result of defendants' knowledge and failure to disclose BNY's improper FX trading practices, any generalized warnings of market and diversification risks that defendants made to the Plan's Participants regarding the Plan's investment in BNY stock did not effectively inform Participants of the past, immediate, and future dangers of investing in BNY common stock.

168.    The Administration Committee, responsible for the operation and administration of the Plan and communication with Participants, either failed to uncover, or uncovered but failed to disclose, the true affect of BNY's improper FX trading practices on BNY's current and future financial health.  The Administration Committee failed to provide the Plan's Participants with complete and accurate information so that they could make informed decisions regarding investing in the BNY Stock Fund.

169.    The Investment Committee, responsible for selection and monitoring of the Plan's investments solely in the best interest of the Plan's Participants, failed to consider whether BNY common stock was a prudent investment for the Plan in the first instance and, upon information and belief, failed to monitor the performance of the same, for purposes of recommending a more prudent level of Plan investment in BNY stock or the elimination of BNY stock entirely as a Plan investment.  Indeed, at all relevant times, the Investment Committee failed adequately to consider whether continuing to offer BNY stock as a Plan investment served the best interests of the Plan's Participants.

170.    The Monitoring Committee, responsible for appointing, monitoring, and (if necessary) replacing the members of the Administration and Investment Committees,

failed adequately to monitor the Administration Committee's operation and management of the Plan and failed adequately to monitor the Investment Committee's selection and monitoring of the Plan's investments.  Indeed, the Monitoring Committee had the full discretion and authority to remove members of the Administration and Investment Committees and yet, failed to do so when the Monitoring Committee either knew or should have known that BNY was engaging in improper FX trading practices and that the Administration and Investment Committee members were not prudently and loyally managing the Plan and its investments by permitting the Plan to continue investing heavily in BNY stock during the Class Period.

171.    At the same time, BNY, the Administration Committee Defendants, the Investment Committee Defendants, and the Monitoring Committee Defendants failed adequately to review the performance of the other defendants who were fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

172.    An adequate investigation by BNY, the Administration Committee Defendants, the Investment Committee Defendants, and the Monitoring Committee Defendants would have revealed to a reasonable fiduciary that investment by the Plan in BNY stock was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect the Plan's Participants against unnecessary loss, and would have made different investment decisions.  Because defendants knew or should have known that BNY stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan, its participants and beneficiaries from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in BNY common stock.

173.   At the same time, unaware that BNY's statements and representations about BNY's FX trading practices were false and misleading and failed to disclose that BNY has been systematically overcharging FX investors, the Plan's Participants invested substantial amounts of their retirement savings in BNY Stock at prices that were artificially inflated.

174.   When the public began to learn the truth about BNY's overcharging scheme, BNY's stock price plummeted, taking with it Participants' vested retirement benefits in the Plan.  Because of defendants' fiduciary breaches, the vested retirement benefits in the Plan have been significantly diminished and impaired.

175.   A prudent fiduciary acting under similar circumstances would have taken reasonable steps to prevent, or at least, minimize the losses sustained by the Plan and to preserve Participant's retirement savings.

176.   In fact, defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of all investments in the BNY Stock Fund; discontinuing all further Participant elective contributions in the BNY Stock Fund; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by BNY they could not loyally serve the Plan's participants in connection with the Plan's acquisition and holding of BNY stock.

177.   Despite the availability of these and other options, defendants failed to take any action to protect participants from losses as a result of the Plan's investment in BNY stock.  In fact, the defendants continued to invest and allow investment of the

Plan's assets in BNY stock even as BNY's improper and unlawful practices came to light.

## CLAIMS FOR RELIEF UNDER ERISA

178.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

179.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

180.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

181.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

182.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982).  They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)    A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

183.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

184.    Plaintiffs therefore brings this action under the authority of ERISA §502(a) for Plans-wide relief under ERISA § 409(a) to recover losses sustained by the

Plans arising out of the breaches of fiduciary duties by the Defendants for violations

under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

**Failure to Prudently and Loyally Manage the Plans' Assets
(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)**

185.    Plaintiffs incorporate the allegations contained in the previous paragraphs

of this Complaint as if fully set forth herein.

186.    At all relevant times, as alleged above, all Defendants were fiduciaries

within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised

discretionary authority or control over the administration and/or management of the Plans

or disposition of the Plans' assets.

187.    Under ERISA, fiduciaries who exercise discretionary authority or control

over management of a Plans or disposition of a Plans' assets are responsible for ensuring

that investment options made available to participants under a Plan are prudent.

Furthermore, such fiduciaries are responsible for ensuring that assets within the Plans are

prudently invested.  Defendants were responsible for ensuring that all investments in the

Company's stock in the Plans were prudent and that such investment was consistent with

the purpose of the Plans.  Defendants are liable for losses incurred as a result of such

investments being imprudent.

188.    A fiduciary's duty of loyalty and prudence requires it to disregard plans

documents or directives that it knows or reasonably should know would lead to an

imprudent result or would otherwise harm plan participants or beneficiaries. ERISA §

404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plans

documents or directives that would lead to an imprudent result or that would harm plan

participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plans trustees, to do so.

189.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plans or its assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plans investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plans.

190.    Defendants breached their duties to prudently and loyally manage the Plans' assets.  During the Class Period these Defendants knew or should have known that, throughout the Class Period, BNY was engaging in a scheme to defraud standing instruction investors by giving them unfavorable currency-exchange rates.  Defendants should have further known that BNY's failure to disclose this scheme artificially inflated the value of BNY common stock.

191.    Defendants further breached their duties of loyalty and prudence by failing to divest the Plans of BNY stock when they knew or should have known that it was not a suitable and appropriate Plans investment.

192.    Defendants breached their duties of loyalty and prudence by failing to ensure that participants liquidated their BNY common stock investments in each of the Plans and transferred the sale proceeds to the other investment options available in the

401(k).  With actual or constructive knowledge that Plan participants did not have full and complete information about the Company's scheme to defraud standing instruction investors, and thus were unable to make fully informed decisions about whether to retain their holdings in Company stock, Defendants had the fiduciary obligation to either inform Plan participants of the need to take action to protect their financial interests or, if necessary, to liquidate ESOP's holdings of Company stock on participants' behalf to ensure that they did not suffer a financial loss.

193.    Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and the Company's concealment of the same and, generally, by conveying inaccurate information regarding the Company's revenues obtained by and from FX trading.  During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock in large part due to the great success and revenue stream created from FX trades, and/or allowed participants in the Plans to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  As such, participants in the Plans could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plans.

194.    Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock.  Defendants had or should have

had knowledge of such breaches by other Plans fiduciaries, yet made no effort to remedy them.

195.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.  Had Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in Company stock and thereby eliminated, or at least reduced, losses to the Plans.

196.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)

197.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

198.    At all relevant times, as alleged above, Defendants were fiduciaries within the Plans within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

199.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on Plans fiduciaries a duty of loyalty, that is, a duty to discharge his duties with respect to a Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

200.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*:

(a)    Failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plans' investment in the Company's securities;

(b)    Failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transaction which made BNY stock an unsuitable investment for the Plan;

(c)    Failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served;

(d)    With respect to each of the failures listed in the preceding subparagraphs, Defendants failed adequately to inform Plaintiff and members of the Class to prevent general investors, creditors and others from discovering BNY's scheme to defraud investors by overcharging them in FX transactions; and

(e)    By otherwise placing the interests of BNY and themselves above the interests of the Participants with respect to the Plan's investment in BNY Stock, by among other things, keeping the Plan's assets heavily invested in BNY common stock when it was imprudent to do so - rather than divesting the Plan's investments in BNY common stock - while certain fiduciaries sold their personally held BNY common stock at artificially inflated prices. As a result, certain fiduciaries personally profited from those sales while the Plan and its Participants suffered massive losses.

201.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff

and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

202.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Failure to Adequately Monitor Other Fiduciaries and Provide Them with Accurate Information (Breaches of Fiduciary Duties in Violation of ERISA § 404 by BNY and the Monitoring Committee)

203.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

204.    At all relevant times, as alleged above, BNY and the Director Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

205.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of BNY and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the Monitoring Committee and other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

206.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, BNY and the Director Defendants, had the duty to:

> (a)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;

(b)     Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)     Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plans' investments;

(d)     Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)     Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investments; and

(f)     Ensure that the monitored fiduciaries report regularly to the monitoring fiduciaries.  The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

207.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a Plans' assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

208.     BNY and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the Administration Committee, as a monitored fiduciary, had access to knowledge about the Company's practices and procedures for obtaining exchange rates for FX transactions pursuant to standing instructions as alleged above, which made Company stock an imprudent retirement investment; (b) failing to ensure that the Administration Committee completely appreciated the huge risk of significant investment of the retirement savings of rank and

file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation; (c) failing to disclose to the Administration Committee accurate information about the operations and financial results of BNY which Defendants reasonably should have known the Administration Committee needed to make sufficiently informed decisions about construing, interpreting, and administering the Plan; (d) failing to ensure that the members of the Administration Committee were prudently and loyally managing and administering the Plan; and (e) to the extent it was necessary, failing to remove and replace members of the Administration Committee for their failure to prudently and loyally manage and administer the Plan.  BNY and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) continuing to invest the assets of the Plans in BNY common stock when it no longer was prudent to do so; and (ii) imprudently allowing the Plans to continue offering BNY stock as an investment alternative.  Despite this knowledge, BNY and the Director Defendants failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

209.    The Monitoring Committee maintained discretionary authority and control with respect to appointing, monitoring, and when necessary, removing members of the Investment Committee which was responsible for selecting, managing, and overseeing the Plan's investments.  Accordingly, the Monitoring Committee Defendants breached their duties to monitor and inform by, among other things, (a) failing to ensure that the Investment Committee, as a monitored fiduciary, had access to knowledge about BNY's practices and procedures for obtaining exchange rates for FX transactions pursuant to

standing instructions, as alleged above, which made BNY stock an imprudent retirement investment; (b) failing to ensure that the Investment Committee appreciated the increased risk posed by the significant investment by rank and file employees in BNY stock; (c) failing to ensure that the Investment Committee possessed accurate information about the operations and financial results of BNY which the Investment Committee needed to make sufficiently informed decisions about what investment options the Plan should continue to offer; (d) failing to ensure that the members of the Investment Committee were prudently and loyally selecting, evaluating, and monitoring the investment options available under the Plan; and (e) to the extent it was necessary, failing to remove and replace members of the Investment Committee for their failure to prudently and loyally select, evaluate, and monitor the investment options available under the Plan.

210.    In addition, BNY and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of BNY that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

211.    BNY and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

212.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

213.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

**Failure to Provide Complete and Accurate
Information to the Plan's Participants and Beneficiaries
Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
(Against All Defendants)**

214.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

215.    During the Class Period, defendants' fiduciary duties bound them to ensure that communications by and about the Plan and its assets were truthful, complete, and not misleading, including information concerning the investment options offered under the Plan.

216.    Throughout the Class Period, defendants failed to provide Plan Participants with complete and accurate information regarding BNY's standing instruction FX trading practices necessary for Plan Participants to accurately assess the quality of an investment in BNY stock.

217.    Instead, defendants conveyed false and misleading material information to the investing public and to the Plaintiffs and the Class, regarding the soundness of BNY stock and the prudence of investing retirement savings in BNY stock.  Because large

percentages of the Plan's assets were invested in BNY stock during the Class Period, losses therefrom materially affected the value of Participants' retirement assets.

218.    Defendants' misrepresentations and omissions were material to the determination of Plaintiffs and members of the Class whether investing in or maintaining their investments in the BNY stock was prudent.  As such, Plaintiffs and members of the Class are presumed to have relied to their detriment on defendants' misleading statements and omissions.

219.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiffs and the members of the Class, suffered damages for which defendants are liable.

## COUNT V

**Co-Fiduciary Liability**
**Breaches of Fiduciary Duties in Violation of ERISA § 405**
**(Against the Administration Committee Defendants, the Investment Committee**
**Defendants, and the Monitoring Committee Defendants)**

220.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

221.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has

knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

222.     As alleged herein, BNY, through its officers and employees, such as the Administration Committee Defendants, the Investment Committee Defendants, and the Monitoring Committee Defendants failed to provide material information to the Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices to the detriment of Plaintiffs and members of the Class, and, thus, knowledge of such practices is imputed to these defendants as a matter of law.  In addition, as alleged herein on information and belief, BNY and the other defendants named in this Count participated in and/or knew about BNY's scheme to defraud standing instruction investors.  Thus, these defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of BNY stock as an investment for the Participants' retirement assets.

223.     Despite this knowledge, the defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of BNY stock during the Class Period.  Defendants did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in BNY stock in the manner alleged herein in violation of ERISA § 405(a)(1)(A).  In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in BNY stock despite knowing such failures were breaches of fiduciary duty under ERISA.  Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

224.    In further violation of ERISA § 405(a)(1)(C), the defendants named in this Count also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole.  Instead, they compounded the problem by further concealing BNY's improper and illegal FX trading practices from Participants and the market as a whole.

225.    In addition, the defendants named in this Count enabled the imprudent asset management decisions of any and all other defendants – including any appointed fiduciaries of the Plan – who lacked knowledge of the circumstances rendering BNY stock imprudent, by failing to provide such persons with complete and accurate information regarding BNY stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by BNY's improper practices, so that these other defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in BNY stock.  In so doing, these defendants breached ERISA § 405(a)(1)(B).

226.    Further, through their failure to properly and effectively monitor their appointees on the Administration Committee, the Investment Committee, and Monitoring committee Defendants and remove those fiduciaries whose performance was inadequate as alleged above, the defendants named in this Count enabled these appointed fiduciaries' imprudent management of the Plan's investment in BNY stock.

227.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants, lost a

significant portion of their retirement investment and Plan Participants materially overpaid for their BNY shares.

228.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

229.    The Plans suffered tens of millions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties, reflected in the diminished account balances of the Plans' participants, significant reputational damages and lost business, high litigation costs, BNY likely disgorgement, and probable civil and criminal penalties, and threatens the Company's future revenue.

230.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plans and its participants would have avoided a substantial portion of the losses that they suffered through the Plans' continued investment in Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

231.    As noted above, as a consequence of Defendants' breaches, the Plans suffered significant losses.

232.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plans any losses to the plans . . ." Section 409

also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

233.     With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the plan's assets to what they would have been had the plan been properly administered.

235.     Plaintiffs, the Plans, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

236.     Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

      A.     A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

      B.     An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

      C.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

      D.     Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

      E.     An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of BNY maintained by the Plans in proportion to the accounts' losses attributable to the decline in BNY's stock price;

      F.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.     An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED: November 15, 2011            Respectfully submitted,

**LAW OFFICE OF ALFRED G. YATES JR., PC**

By:  s/Alfred G. Yates, Jr.
Alfred G. Yates, Jr. (PA17419)
Gerald L. Rutledge (PA62027)
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Tel: (412) 391-5164
Fax: (412) 471-1033

*Attorneys for Plaintiff*

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc L. Ackerman
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
Tel: (610) 667-6200
Fax: (610) 667-9029

*Attorneys for Plaintiffs and the Proposed Class*